Filed 2/24/25  P. v. Smith CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>KENNETH CHARLES SMITH,<br><br>    Defendant and Appellant. | F087341<br><br>(Super. Ct. No. PCF325119)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Juliet L. Boccone, Judge.

Charles M. Bonneau, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Darren K. Indermill, and Erin Doering, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Kenneth Charles Smith (appellant) killed his elderly parents, Clarence and Evelyn Smith, by strangling them to death. A jury convicted appellant of two counts of first degree murder (Pen. Code, §§ 187, subd. (a), 189, subd. (a)),[1] and found true two multiple-murder special-circumstance allegations (§ 190.2, subd. (a)(3)). After the verdict was rendered, appellant withdrew his plea of not guilty by reason of insanity. The trial court sentenced appellant to two consecutive terms of life in prison without the possibility of parole.

Appellant raises numerous claims on appeal. He contends the trial court improperly limited the scope of expert testimony, should have allowed a defense witness to testify remotely, and violated his right to confrontation by admitting the autopsy reports of a nontestifying pathologist. He also raises claims regarding the admissibility of evidence and prosecutorial misconduct during closing argument. We conclude that no error occurred, or that any presumed error was harmless. The parties agree, however, that appellant is subject to only one multiple-murder special-circumstance allegation, and we strike the duplicative finding. In all other respects, we affirm.

## BACKGROUND

### I. Clarence and Evelyn Smith Are Found Dead in a Trailer Outside of Their Residence.

Clarence Smith, age 84, and Evelyn Smith, age 83, lived together at their home in rural Tulare County.[2] On October 4, 2015, law enforcement received a call from a concerned friend who reported she had not seen Clarence or Evelyn for several days. Around 7:00 p.m., an officer responded to their residence, but found it was surrounded by a large fence with a locked gate. The officer contacted Clarence and Evelyn's son, Keith

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

[2]     For the purpose of clarity, we refer to the decedents by their first names through the remainder of this opinion. No disrespect is intended.

Smith, who lived next door. Keith Smith stated he saw his parents that morning. The officer reported his findings to the initial caller and left the area.

Officers returned to Clarence and Evelyn's residence around 8:30 p.m., after receiving additional welfare check requests. The officers received permission from Keith Smith to enter the residence, then cut the lock on the front gate to enter the property. An officer kicked in the back door of the main residence. The inside of the residence was clean and undisturbed. Clarence and Evelyn were not inside.

A single axel semitrailer and a pontoon boat were parked side by side in the backyard of the residence. A white van was also parked nearby. The trailer was secured with a padlock, and officers obtained a key from Keith Smith to open it. The main area of the trailer consisted of a work bench and tools. To the right of the main entrance was a makeshift wall with a door secured by a padlock. The officers cut the lock to enter.

Inside, officers found a small room that appeared to be converted living quarters. The bodies of Clarence and Evelyn were on the floor, wrapped in blankets and covered in a tarp. The blankets on Evelyn's body were secured with strips of duct tape, which were wrapped around her midsection, neck, and mouth. Clarence's body was positioned on top of Evelyn's body. He had two lacerations on his head, and there was blood pooled beneath. His dentures were not in his mouth, and a set of dentures were found in a can near the workbench area. His pants were positioned below his waist, partially exposing his genitalia. A property tax document was positioned between his hands and his lap.

Two days after the bodies were discovered, Clarence and Evelyn's daughter contacted law enforcement and stated she found a note inside of the white van parked on the property. An officer searched the van and discovered a piece of cardboard on the dash. Handwritten on the cardboard was the following: "mom and dad this way." There was also a handwritten arrow pointing toward the trailer where the bodies were found.

## II.     Autopsies of the Decedents.

Dr. Gary A. Walter, a forensic pathologist, performed autopsies on Clarence and Evelyn in 2015.  Dr. Walter testified at the preliminary hearing but passed away before the instant matter proceeded to trial.  Dr. Thomas Bennett, also a forensic pathologist, reviewed the autopsy materials, including reports and diagrams prepared by Dr. Walter and photographs from the autopsies.  Dr. Walter's autopsy reports were admitted into evidence.

Dr. Bennett opined that Clarence and Evelyn were both killed by manual strangulation.  The hyoid bone in Clarence's neck was broken, indicative of manual trauma caused by a hand or forearm squeezing on the neck.  Evelyn's hyoid bone was not broken, but there was significant hemorrhaging around the neck and larynx, consistent with a blunt force, crushing injury caused by hands squeezing the neck.

Dr. Bennett explained that strangulation will result in loss of consciousness after 15 to 30 seconds.  However, to cause death, continuous pressure must be applied to the neck for at least two minutes.  More time is needed if the pressure is not continuous.

Dr. Bennett also observed that Clarence and Evelyn each had multiple rib fractures, suggesting that something "pushed down forcefully" on the lower portion of the chest.  Hemorrhaging around the rib fractures indicated the injuries were sustained while they were alive.

Clarence and Evelyn both had bruising and abrasions on the face.  Clarence also had a laceration on the forehead and the back of the head caused by blunt force.  They both had bruising on the back of their hands and arms, consistent with defensive injuries sustained during a struggle.

## III.     Surveillance Video from the Decedents' Residence.

Officers recovered video from a surveillance system at the Smith residence.  One camera was pointed toward the front gate of the property.  The other covered a segment of the backyard and part of the pontoon boat but did not show the trailer.  Portions of

video surveillance recorded on October 4, 2015, were admitted into evidence, and played for the jury.

Around 9:30 a.m., appellant is shown walking back and forth between the pontoon boat and his truck with his dog following behind him. It starts to rain, and appellant begins covering the pontoon boat with a tarp. Around 10:20 a.m., Clarence begins helping appellant cover the boat. Evelyn walks by the boat at various points and appears to help secure the tarp over the boat. Clarence is last seen in the video at 11:38 a.m., and Evelyn is last seen at 11:40 a.m.

Appellant continues to work on the boat until 12:17 p.m., at which point he walks out of view of the camera. He comes back into view at 12:50 p.m. On three occasions, he retrieves what appears to be blankets or tarps from his truck and carries them off camera in the direction of the trailer. He gets into his truck with his dog at approximately 4:20 p.m. and leaves the property.

## IV.     Appellant Admits to His Friend that He Killed His Parents.

Daniel Quella testified appellant arrived at his house at about 10:00 p.m. on October 4, 2015. Quella lived near Lake Isabella, approximately two hours from the Smith residence. Quella had known appellant for several years and considered him a friend. Appellant mentored Quella's son in lumberjacking and provided Quella with timber during the winter.

Quella was not expecting appellant. When appellant arrived, he got out of his truck, grabbed Quella, and started crying. Appellant stated his mother and father were dead, and that he wanted Quella to take care of his dog.

Appellant told Quella he had been staying in a pontoon boat outside of his parent's house. Earlier that day, it started to rain, and he went to a hardware store to get a tarp to cover his belongings. When he returned home, his property had been removed from the boat, and he started arguing with his father. The argument turned into a physical

5.

altercation. Appellant initially told Quella he "blacked out," and woke up to find his parents on the ground.

Quella continued to question appellant about the altercation, and appellant eventually stated he killed his parents. Quella was in disbelief and asked appellant numerous times if appellant was telling the truth. Each time, appellant confirmed that he killed his parents. Appellant stated he got in a fight with his father and strangled him to death, and at some point, during the altercation, his mother jumped on his back. He did not specify how he killed his mother. Appellant admitted that he dragged their bodies into "the room," but that he should have left the crime scene as it was so his "story could be told," because his father had attacked him. Appellant stated that when his father started attacking him, he did not realize how strong his father was.

Quella described appellant as distraught, "broke down," and not himself. He was difficult to understand and gave answers that were "almost gibberish" and did not make sense. Appellant told Quella he had used methamphetamine but did not specify how much or when.

Quella testified appellant had previously told him his father was abusive, and that he was afraid of his father. Appellant believed his mother and his sister were stealing his social security and disability checks, and that his parents stole his house from him. Quella explained that appellant's parents owned multiple houses, and appellant had been living in a camp in the mountains without electricity or running water. Quella believed appellant suffered from mental health issues, noting appellant previously told him he had been abducted by aliens. Appellant did not have many friends but was very close with his dog.

After they spoke for several hours, Quella fed appellant a meal and gave him some sleeping pills to help him calm down. Appellant fell asleep on Quella's couch. Around 11:00 p.m., Quella took appellant's phone and made an anonymous call to the police to request a welfare check on appellant's parents. Quella explained that he did not know if

6.

appellant had told him the truth and wanted appellant's parents to get help if they were still alive.

By the time Quella placed the call, law enforcement was already investigating the homicides. Police dispatch performed a "reverse 911 call" and traced the location of the call. Officers began monitoring Quella's residence and obtained a search warrant.

The next morning, appellant and Quella went in front of Quella's house for cigarettes and coffee. Quella asked appellant what he was going to do. Appellant said if the police showed up, he would "walk out" to them, and hoped they would shoot and kill him. Quella told appellant he would tell the police the truth, and appellant agreed that he would do the same thing.

At some point during their conversation, Quella noticed red dots from laser sights on his chest and saw numerous law enforcement officers outside of his residence. Appellant complied with orders from law enforcement and was placed under arrest.

## V. Appellant Admits to Law Enforcement that He Killed His Parents.

After his arrest, appellant was interviewed in custody by a detective. An audio and video recording of the interview was admitted into evidence and played for the jury.

Appellant was 57 years old at the time of the interview. He started working in logging at a young age. He had been living in the mountains but came down to his parents' residence because he had not been to the doctor in a while. He had been staying on the pontoon boat for about two weeks.

The detective began the interview by asking appellant if he knew why he was there. Appellant replied, "Cause I murdered my parents." The detective asked appellant why he did that, and appellant responded, "[C]ause they're always st … stealing stuff from me."

Appellant stated on the day of the murders, it started to rain, and his clothing and blankets on the pontoon boat got wet. His parents went and bought him a tarp. At some point, his mother told him to get his blankets so she could dry them, but he could not find

7.

them. They started to argue near the pontoon boat. When the argument started, appellant's father was working nearby on a pump with a hammer. He approached appellant with the hammer, grabbed him, and told him he is not going to speak to his mother like that. Appellant grabbed his father, and they fell to the ground, and his mother jumped on his back. Appellant then grabbed his parents by their throats and "choked the air out of them." He denied hitting his father with anything, claiming his father hit his head when he fell.

Appellant wrapped his parents' bodies in blankets and a tarp and dragged them into the trailer. He put tape on the bodies to keep the blankets in place. He also swept the area and moved his parents' dentures off the floor. He explained he cleaned up the "mess" because he wanted to "buy [himself] some time to secure" his dog, which he described as his best and only friend. When he left, he took his dog to Quella's residence, where he was arrested the next morning.

Appellant had no visible injuries except for two small scratches on his face. He admitted he used methamphetamine a few days prior.

Throughout the interview, appellant made numerous accusations about his parents. He claimed his father physically abused him growing up and came close to killing him. The last time his father hit him was in the year 2000, when he struck him with a flashlight. His parents owned multiple houses, and one was supposed to be his, but they "willed [him] out." They stole his disability money, mistreated his grandmother, and stole from his brother. They lied to the police about him in the past and almost got him put in prison. He took drugs to escape the reality of growing up with his parents, and they "cut [him] out of everything" because he was a drug addict.

Appellant also alleged that his parents were members of three different "cults," including the "Satan's Slaves motorcycle club." He claimed his parents molested and killed children and collected their body parts, and that some members of law enforcement were involved.

8.

Appellant claimed he "snapped" after his father grabbed him and there was "[n]o premeditation whatsoever." However, when asked if what he did to his parents was wrong, he responded, "[P]ut it this way, if [G]od hates a thieving liar, and that's all they are," then repeated his accusations that his parents stole from him and tried to put him in prison.

## VI.     Appellant's Prior Acts of Violence.

A woman testified that in 2013, appellant was staying in her guest house to help take care of her property, which was in the mountains. She had known appellant for several years and considered him a friend. One morning, she awoke to appellant in her bedroom screaming that she was being too loud. He hit her with the butt of a shotgun, dragged her across the floor, and strangled her with his hands to the point that she lost consciousness. During the attack he told her that he was Satan and was there to kill her because she believed in God. When she came to, she jumped off a balcony and ran to her car.

The mother of appellant's children testified appellant physically abused her throughout their 20-year relationship. She described two incidents in detail. In 1996, appellant punched her in the eye during an argument. In 1997, he hit her during an argument and strangled her. She explained that when appellant abused her, he often accused her of being evil or worshiping Satan. She ended their relationship in part because of appellant's accusations and bizarre behavior. She had concerns about appellant's mental health, but noted there were periods where he acted normal.

The mother of appellant's children also described an incident in 2000 when they went to appellant's parents' residence to collect some of his belongings. While she waited outside of the house, she heard arguing. She went inside and saw appellant standing over Clarence and punching him in the face. Evelyn tried to call the police, but appellant ripped the phone out of the wall.

9.

In 2013, Evelyn called 911 to report appellant had become aggressive and violent in her home. An officer contacted appellant at the residence, and he admitted he got into an argument with his parents because they were trying to get him to go to a doctor's appointment. Clarence told the officer appellant threatened to "cut off his head and place it in [his mother's] lap." Evelyn reported appellant told her if she called the police, she "better believe they will have a reason to put me away for the rest of my life."

Clarence and Evelyn told the officer they were afraid appellant would hurt or kill them. Clarence stated he got into a physical altercation with appellant about one year prior but did not report it because he did not want appellant to get in trouble.

Appellant was arrested, and charges were filed by the district attorney's office. Sometime later, Evelyn submitted a letter to the district attorney's office stating they had overreacted, and appellant did nothing wrong. She explained they became frustrated with appellant's reluctance to see a doctor, and appellant was justified in getting angry.

## VII.  Defense Evidence.

The sole witness for the defense was Dr. Laljit Sidhu, a licensed clinical psychologist. He interviewed appellant four years before trial, and again about one month before trial. He also reviewed case records, including appellant's recorded interview, police reports, witness statements, and prior reports by psychologists and psychiatrists.

During the initial interview, which occurred in 2019, appellant claimed that his family belonged to a satanic motorcycle club that molests and kills children, and that he was ostracized and abused for refusing to join. He denied suffering from mental illness but acknowledged having some visual hallucinations. According to Dr. Sidhu, appellant exhibited "disorganized thought," meaning he was unable to maintain a logical, coherent line of thought, and gave lengthy, circular answers. Based on appellant's history, delusional beliefs, and disorganized thought, Dr. Sidhu diagnosed appellant with schizophrenia.

10.

When Dr. Sidhu interviewed appellant the second time, he observed his symptoms of schizophrenia had gotten worse. His delusions appeared to have grown stronger, and his thinking was far more disorganized. This confirmed the original diagnosis that appellant suffered from schizophrenia.

Dr. Sidhu also reviewed appellant's law enforcement interview, which was conducted on October 5, 2015, the day after the killings. As in the 2019 and 2023 psychological interviews, appellant exhibited delusional thinking, disorganized thought and speech, and consistently failed to recognize his own mental illness. Based on the proximity of the law enforcement interview, Dr. Sidhu opined appellant was suffering from schizophrenia on the day of the killings.

Dr. Sidhu ruled out the possibility that appellant was malingering. He explained that appellant showed a lack of insight into his mental illness and exhibited disorganized thought, which is difficult to feign. He also ruled out substance abuse psychosis because appellant was still exhibiting symptoms of schizophrenia while incarcerated. He noted, however, that methamphetamine use can exacerbate symptoms of schizophrenia.

Dr. Sidhu explained that a person with schizophrenia often harbors a delusional belief system, and his or her perceptions or actions will be filtered through those delusions. This disconnection from reality may result in impulsive or irrational behavior. However, a schizophrenic person will go through periods of normal thought patterns and behaviors and will not be disordered all the time or in all circumstances.

Based on a hypothetical question mirroring the evidence at trial, Dr. Sidhu opined that appellant's psychological state at the time of the killings could have been impacted by his schizophrenia. Given that appellant harbored delusional beliefs in his law enforcement interview, it is possible those beliefs were present on the day of the killings and could have impacted his perception of others. Appellant's delusions about his parents may have caused him to be "hypervigilant." He may have misinterpreted their behaviors and intentions and believed them to be greater threats than they actually were. Thus,

11.

appellant's schizophrenia may have caused him to act impulsively and irrationally in response to perceived threats, and without consideration of the consequences of his actions.

In response to a question from the prosecutor, the psychologist opined that it was "possible, but not likely" that appellant was "not impacted by schizophrenia and was able to make a choice in what he did."

## VIII.  Rebuttal Evidence.

A detective with extensive experience investigating domestic violence incidents described the cycle of violence in domestic relationships, including between children and parents.  She explained that the cycle begins with the perpetrator becoming angry, leading to an act of verbal or physical abuse.  After the abusive conduct, the perpetrator apologizes and promises not to do it again.  Following a period of calm, the cycle restarts, and the abuse occurs again.  Victims do not always report abuse, and often recant after reporting.

## **DISCUSSION**

## I.    The Trial Court Did Not Err in Prohibiting the Defense Expert from Opining that Appellant Acted Impulsively When He Killed His Parents.  Any Presumed Error Was Harmless.

Appellant contends the trial court improperly limited Dr. Sidhu's testimony by only allowing him to testify that appellant *could have* acted impulsively in response to his delusions at the time of the killings, rather than offering the opinion that appellant *did* act impulsively.  According to appellant, such testimony would have created a reasonable doubt that appellant acted with premeditation and deliberation.  We conclude the claim is forfeited because defense counsel did not object below.  In any event, the trial court properly limited Dr. Sidhu's testimony under section 29, which prohibits an expert from opining "as to whether the defendant had or did not have the required mental states … for the crimes charged."  Even assuming such limitation was improper, any presumed error was harmless.

12.

## A.     *Background.*

In his written report, Dr. Sidhu diagnosed appellant with schizophrenia and opined he was psychotic at the time of the killings.  He concluded appellant had "difficulty interpreting events and engaging in rational reasoning," and therefore it is likely his "perceptions of his parents' actions were filtered through both his psychosis and his memories of physical abuse."

Appellant filed a motion in limine requesting to present evidence of diminished actuality through the testimony of Dr. Sidhu.  The People did not oppose the motion, but noted that under sections 28 and 29, an expert witness is precluded from opining as to whether a defendant actually harbored the required mental states for the charged offenses.

During a pretrial hearing on motions in limine, the trial court stated it wanted to "prescreen" the scope of the proffered expert testimony on diminished actuality before it goes before the jury.  The court explained that Dr. Sidhu could not opine that appellant lacked a specific mental state but could testify about appellant's mental condition and how it may have affected his intent or mental state at the time of the alleged offenses. Defense counsel expressed agreement with these parameters and did not object.

During Dr. Sidhu's testimony, defense counsel began to ask a hypothetical question that mirrored the evidence at trial.  The People objected, and the court addressed the parties at sidebar.  The prosecutor expressed concern that the hypothetical question was so fact specific that Dr. Sidhu's response might embrace "the ultimate issue" of appellant's mental state at the time of the killings and requested the scope of the hypothetical be "limited."

The trial court denied this request but reminded defense counsel that Dr. Sidhu cannot opine as to appellant's state of mind at the time of the offenses.  Defense counsel agreed but referred the court to *People v. Nunn* (1996) 50 Cal.App.4th 1357 (*Nunn*) as an example of "how close up to that ultimate opinion the [expert] can walk to."  Defense counsel noted that under *Nunn,* an expert can opine that a defendant was suffering from

schizophrenia and explain it could have caused said defendant to act impulsively. (See *id*. at p. 1365.) The trial court agreed with defense counsel's reading of *Nunn,* but observed there is a "very fine distinction" between expert testimony that appellant's encounter with his parents "was the type that could result in impulsive reactions," and expert testimony that appellant "acted impulsively." The trial court then instructed defense counsel to ensure Dr. Sidhu understood he cannot not testify that appellant "acted impulsively based on the factual situation," but can testify that appellant's mental condition "could have caused" him to act impulsively. Defense counsel agreed and did not object.

### B. *The claim is forfeited.*

As a threshold matter, respondent contends appellant forfeited the instant claim by failing to object below. We agree.

Generally, "a criminal defendant who does not challenge an assertedly erroneous ruling of the trial court in that court has forfeited his or her right to raise the claim on appeal." (*In re Sheena K*. (2007) 40 Cal.4th 875, 880.) "The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.) "Considering an issue for the first time on appeal is often unfair to the trial court, unjust to the opposing party, and contrary to judicial economy because it encourages the embedding of reversible error through silence in the trial court." (*In re M.H.* (2016) 1 Cal.App.5th 699, 713–714.)

Here, while the parties discussed the permissible scope of Dr. Sidhu's testimony at length, defense counsel did not object to the parameters set forth by the trial court. Moreover, defense counsel did not argue that Dr. Sidhu should have been allowed to opine that the killings were an impulsive response to appellant's delusional beliefs. As we discuss below, appellant's claim is predicated on his assertion that *Nunn* was wrongly decided. But defense counsel urged the trial court to follow *Nunn* and permit Dr. Sidhu

to testify appellant's schizophrenia could have caused him to act impulsively. Thus, appellant not only failed to make a specific and timely objection, he requested the trial court follow authority he now claims is invalid. Accordingly, the claim is forfeited.[3] (*People v. Partida* (2005) 37 Cal.4th 428, 434; See *People v. DeHoyos* (2013) 57 Cal.4th 79, 120–121; *People v. Armstrong* (2019) 6 Cal.5th 735, 791; *People v. Delgado* (2017) 2 Cal.5th 544, 580.)

### C.  *Applicable law and standard of review.*

Section 28, subdivision (a) provides that evidence of a defendant's mental illness "is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged." Based on this provision, a defendant may rely on the defense of "diminished actuality" (*People v. Steele* (2002) 27 Cal.4th 1230, 1253, italics omitted), meaning a jury may consider evidence of mental illness "in deciding whether the defendant *actually* had the required mental states for the crime." (*Ibid*., italics added.)

Expert testimony in support of a diminished actuality defense is admissible so long as it stays within the confines of sections 28 and 29. (*People v. Cortes* (2011) 192 Cal.App.4th 873, 910 (*Cortes*).) Section 28 precludes "jury consideration of mental [illness] as evidence of a defendant's *capacity* to form a requisite criminal intent."

---

[3]    In a footnote in his opening brief, appellant briefly asserts that if the instant claim is forfeited it is due to ineffective assistance of counsel. He provides no additional argument and cites only to *Strickland v. Washington* (1984) 466 U.S. 668, without citation to a specific page. Even after respondent raised the forfeiture issue, appellant did not address his ineffective assistance of counsel claim further in his reply brief.

We need not consider a conclusory contention raised only in a footnote. (*People v. Stanley* (1995) 10 Cal.4th 764, 793; *Sabi v. Stering* (2010) 183 Cal.App.4th 916, 947.) Regardless, because we exercise our discretion to address the merits of the instant claim, we need not consider the alternative ineffective assistance of counsel claim. (See *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 92 [reaching merits because appellant also raised ineffective assistance of counsel claim]; *In re Victor L.* (2010) 182 Cal.App.4th 902, 928 [same].)

(*People v. Williams* (1997) 16 Cal.4th 635, 677.)  Thus, expert opinion "on whether a defendant had the mental capacity to form a specific mental state" is inadmissible. (*People v. Coddington* (2000) 23 Cal.4th 529, 582. overruled on another ground by *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

Section 29 prohibits any expert from testifying "as to whether the defendant had or did not have the required mental states … for the crimes charged."  It specifies that "[t]he question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact."  Accordingly, an expert may not opine as to whether the defendant *actually* formed a mental state that is an element of a charged offense.  (*People v. Coddington, supra.* 23 Cal.4th at p. 582.)

Despite these restrictions, a defendant may present "detailed expert testimony relevant to whether [he] harbored a required mental state or intent at the time he acted." (*Nunn, supra,* 50 Cal.App.4th at p. 1365.)  Sections 28 and 29 "leave an expert considerable latitude to express an opinion on the defendant's mental condition at the time of offense, within the confines, of course, of [their] twin prohibitions: no testimony on the defendant's capacity to have, or actually having, the intent required to commit the charged crime." (*Cortes, supra,* 192 Cal.App.4th at p. 910.)  Thus, an expert may properly opine that a defendant suffered from a mental illness, describe the effects of the mental illness, and explain how it may have affected the defendant at the time of the offense.  (*Id.* at p. 908, *Nunn, supra,* 50 Cal.App.4th at p. 1365.)  Such testimony may provide the jury "a basis to *infer*" that due to the mental illness the defendant did not actually harbor a required mental state.  (*Cortes,* at p. 912.)

A trial court has "broad discretion in deciding whether to admit or exclude expert testimony." (*People v. McDowell* (2012) 54 Cal.4th 395, 426.)  We review such a ruling for abuse of discretion.  (*Ibid.; People v. Vieira* (2005) 35 Cal.4th 264, 292; *People v. Watson* (2008) 43 Cal.4th 652, 692.)  It will not be disturbed except on a showing that the trial court applied an incorrect legal standard or exercised its discretion in an arbitrary,

16.

capricious, or patently absurd manner.  (*People v. Knoller* (2007) 41 Cal.4th 139, 156; *People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)

### D. *An abuse of discretion did not occur.*

Appellant asserts Dr. Sidhu should have been allowed to opine that, at the time of the killings, appellant acted impulsively "in obeyance to his delusional stimuli."  He argues the trial court erred by limiting Dr. Sidhu to the "vague and conditional" opinion that appellant's schizophrenia could have caused him to act impulsively in response to his delusions.

We are not persuaded.  The trial court allowed appellant to present extensive testimony about his mental illness and how it affected his mental condition at the time of the killings.  Dr. Sidhu diagnosed appellant with schizophrenia and explained that it can cause delusional thinking and disconnection from reality, resulting in impulsive and irrational behavior.   He opined that appellant was suffering from schizophrenia on the day of the killings, and that it likely impacted his decision making.  In response to a hypothetical question mirroring the evidence at trial, Dr. Sidhu opined that appellant's delusions may have caused him to act impulsively and irrationally without considering the consequences of his actions.  This testimony was permissible under section 28 and 29 because it was relevant to whether appellant actually formed the mental states of malice aforethought and premeditation and deliberation, but it did not amount to an opinion that appellant actually lacked those mental states at the time of the killings.

Allowing Dr. Sidhu to opine that appellant *did* act impulsively when he killed his parents would have crossed this line.  " 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance."  (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)  An impulsive decision to kill is not premeditated and deliberate.  (*People v. Perez* (1992) 2 Cal.4th 1117, 1124; *People v. Thomas* (1945) 25 Cal.2d 880, 901; see CALCRIM No. 521.)  Section 29 plainly prohibits an expert from testifying "as to whether the defendant had or did not

have the required mental states … for the crimes charged."  In this context, an opinion that appellant killed impulsively would have been no different from an opinion that appellant killed without premeditation and deliberation.  (See *Nunn, supra,* 50 Cal.App.4th at pp. 1364–1365.)

In *Nunn,* the court upheld similar limitations on expert opinion.  There, the defendant was convicted of attempted murder after firing his rifle at a group of men. (*Nunn, supra,* 50 Cal.App.4th at p. 1360).  The defendant sought to admit expert psychological testimony that because of his alcohol abuse and the trauma he experienced while serving in Vietnam, he "had a tendency to overreact to stress," and "fired his rifle impulsively."  (*Id.* at pp. 1361–1362.)  The trial court agreed the defendant could present evidence of his "mental condition and the effect such condition would have on his state of mind at the time of the shooting," but precluded the expert from opining appellant acted impulsively.  (*Id.* at pp. 1362–1363)

*Nunn* held the expert testimony was properly limited under section 29, reasoning the opinion appellant fired his rifle impulsively was no different than the opinion appellant acted without the intent to kill.  (*Nunn, supra,* 50 Cal.App.4th at pp. 1364– 1365.)  *Nunn* explained that "section 29 does not simply forbid the use of certain words….  An expert may not evade the restrictions of section 29 by couching an opinion in words which are or would be taken as synonyms for the mental states involved … [nor offer] the opinion that the defendant at the time he acted had a state of mind which is the opposite of, and necessarily negates, the existence of the required mental state."  (*Nunn,* at p. 1364.)  Thus, it was permissible for the expert to opine that the defendant's history of psychological trauma could cause him to "overreact to stress and apprehension" and act "impulsively under certain particular circumstances."  (*Id.* at p. 1365.)  The expert could also have opined whether the defendant's encounter with his victims "was the type that could result in an impulsive reaction from one with [his] mental condition."  (*Ibid*.)

However, the expert could not conclude the defendant "acted impulsively, that is, without the intent to kill." (*Ibid*.)

Here, as in *Nunn*, the trial court placed appropriate limits on Dr. Sidhu's testimony. Dr. Sidhu was given wide latitude to express an opinion on appellant's mental condition at the time of the offenses to give the jury a basis to infer that appellant killed without premeditation and deliberation. But the ultimate issue of whether appellant actually harbored the requisite mental states was for the jury to decide. (§ 29.) Allowing Dr. Sidhu to testify that appellant killed impulsively, and thus, without premeditation and deliberation, would have usurped this role.

Appellant relies primarily on *Cortes*, but it does not support his position. In *Cortes*, the trial court prohibited the defendant from introducing psychiatric testimony that he suffered from posttraumatic stress disorder and entered a dissociative state when he stabbed and killed another person at a house party. (*Cortes, supra,* 192 Cal.App.4th at pp. 877, 899–900.) On appeal, *Cortes* concluded the expert should have been allowed to testify about the defendant's mental illness, opine that appellant entered a dissociative state, and explain that such states may interfere with a person's ability to form intent. (*Id.* at pp. 910–911.) Additionally, the expert should have been allowed to explain that dissociation "*can* cause [a] person to act without conscious volition," and that many people who have experienced dissociation describe it as going "on automatic." (*Id.* at p. 911, italics added in original.) *Cortes* rejected the respondent's argument that the latter testimony is impermissible because it "*could be interpreted* as 'tantamount' to testifying that [the] defendant did not have the mental state required by the crime charged." (*Id.* at p. 910, italics added.) Such testimony would only "have given the jury basis *to infer*" appellant acted without the requisite mental state, but it fell short of an impermissible opinion that appellant actually lacked that mental state. (*Id.* at p. 912.)

Seizing on *Cortes's* use of the word "tantamount," appellant argues *Cortes* repudiated *Nunn's* conclusion that an expert cannot evade section 29 by opining the

19.

defendant acted with "a state of mind which is the opposite of, and necessarily negates, the existence of the required mental state." (*Nunn, supra,* 50 Cal.App.4th at p. 1364.) He urges this court to reject *Nunn* and adopt his interpretation of *Cortes*. However, *Cortes* did not hold that section 29 allows an expert to offer an opinion that is "tantamount" to testifying the defendant did not have a required mental state. Rather, it held section 29 does not prohibit expert opinion that "could be interpreted" as such. (*Cortes, supra,* 192 Cal.App.4th at p. 910.) *Cortes* explained that sections 28 and 29 give a defense expert "considerable latitude" to give testimony that provides a "basis to *infer*" that the defendant did not act with a certain mental state. (*Cortes, supra,* 192 Cal.App.4th at pp. 910–912.) But *Cortes* did not authorize the defense expert to express an opinion that the defendant did not actually have a required mental state at the time of the offenses, either directly or with synonymous language. The expert was permitted to testify that dissociation *can* cause a person to act with conscious volition, not opine that appellant actually acted without conscious volition.

Similar to *Cortes,* in the instant case, Dr. Sidhu was permitted to opine that appellant was suffering from schizophrenia at the time of the killings, and his delusions could have caused him to act irrationally, impulsively, and without consideration of the consequences of his actions. But the trial court properly prohibited Dr. Sidhu from opining that appellant did act impulsively when he killed his parents. Such opinion would have embraced the ultimate issue of whether appellant "had or did not have the required mental states … for the crimes charged," which is reserved for the jury to decide. (§ 29.)

Based on our review of the record, we conclude the trial court placed appropriate limits on Dr. Sidhu's testimony in accordance with sections 28 and 29. Accordingly, the trial court did not abuse its discretion, and this claim lacks merit.

**E.**    *Any presumed error was harmless.*

Even assuming the trial court's limitation of Dr. Sidhu's testimony was erroneous, it did not prejudice appellant.

The erroneous exclusion of expert testimony is state law error and ordinarily subject to the prejudice standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).  (*People v. McNeal* (2009) 46 Cal.4th 1183, 1203; *People v. Stoll* (1989) 49 Cal.3d 1136, 1163.)  Under *Watson*, reversal is not required unless it is reasonably probable the defendant would have obtained a more favorable result had the error not occurred.  (*Watson,* at p. 836.)

Appellant argues, however, that the limitations placed on Dr. Sidhu's testimony rendered his trial fundamentally unfair in violation of his right to due process.  He contends the alleged error is subject to the more stringent standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*), which applies to errors of a constitutional dimension.  Under *Chapman,* reversal is required unless the reviewing court can conclude beyond a reasonable doubt that the error did not contribute to the verdict.  (*Ibid*.)

We need not decide whether the *Chapman* or *Watson* standard for prejudicial error applies here because the alleged error was harmless under either standard.  Initially, we observe the challenged limitations on Dr. Sidhu's testimony did not prevent appellant from presenting extensive evidence in support of his diminished actuality defense and arguing it to the jury.  Dr. Sidhu was afforded wide latitude to testify about appellant's mental condition at the time of the killings.  The import of his testimony was clear: appellant was suffering from a mental illness characterized by delusional, impulsive, and irrational behavior.  Moreover, during closing argument, defense counsel urged the jury to infer from Dr. Sidhu's testimony that appellant's schizophrenia, combined with the stress of the argument with his parents, caused him to react impulsively.

Despite this, the jury rejected diminished actuality, finding appellant guilty of two counts of first degree murder based on findings of premeditation and deliberation. Dr. Sidhu's proffered opinion that appellant *did* act impulsively would have been largely redundant and done little to advance the defense theory. Its exclusion did not contribute to the jury's finding that appellant acted with the requisite mental states.

In addition, the evidence that appellant killed with premeditation and deliberation was overwhelming. Appellant harbored great animus toward his parents, and he previously threatened to kill them, suggesting he had thought about doing so in advance. But most compellingly, appellant killed his parents by strangling them with his hands. He strangled not just one person, but two, and applied enough pressure to their chests to inflict multiple rib fractures. His parents' bodies showed signs of a struggle, including defensive wounds on their hands and arms, and abrasions and lacerations on their heads. As the pathologist explained at trial, death by strangulation requires the application of continuous pressure to the neck for at least two minutes, and even longer if the pressure is not continuous. "This prolonged manner of taking a person's life, which requires an offender to apply constant force to the neck of the victim, affords ample time for the offender to consider the nature of his deadly act." (*People v. Hovarter* (2008) 44 Cal.4th 983, 1020; see *People v. Stitely* (2005) 35 Cal.4th 514, 544.)

Appellant argues Dr. Sidhu's opinion that appellant acted impulsively would have been enough to create reasonable doubt that he premeditated and deliberated. But the evidence showed appellant subdued and strangled his parents to death, keeping his hands around their throats for more than two minutes as they fought for their lives. By its nature, this was not impulsive conduct. Expert opinion that appellant acted impulsively would have been insufficient to overcome conclusive evidence to the contrary.

Considering the jury's rejection of appellant's diminished actuality defense and the overwhelming evidence of premeditation and deliberation, the verdict rendered in this trial was surely unattributable to the purported error. (*Sullivan v. Louisiana* (1993)

508 U.S. 275, 279.) Accordingly, we conclude beyond a reasonable doubt that the limitations on Dr. Sidhu's testimony did not contribute to the verdict, and this claim lacks merit. (See *Chapman, supra,* 386 U.S. at p. 24.) Likewise, it is not reasonably probable that the verdicts would have been more favorable to appellant absent the purported error. (See *Watson, supra,* 46 Cal.2d at p. 836.) Any presumed error was harmless.

## II. The Trial Court Did Not Err in Excluding the Conclusions of a Nontestifying Psychological Expert. Any Presumed Error Was Harmless.

The trial court precluded Dr. Sidhu from relating the diagnosis of another psychologist who interviewed appellant prior to trial. Appellant contends this was error, arguing the conclusions of the nontestifying psychologist were admissible if Dr. Sidhu relied on them in forming his own opinion. We conclude no error occurred, and that any presumed error was harmless.

### A. *Background.*

In 2021, the trial court appointed Dr. Brandi Matthews pursuant to section 1369 to determine whether appellant was competent to stand trial. She interviewed appellant in 2021 and 2022 and authored two separate competency reports.

In her 2021 report, Dr. Matthews observed appellant exhibited "prominent delusional beliefs," and listed numerous examples of his delusional statements. She diagnosed appellant with "Delusional Disorder" and opined he was not competent to stand trial. She stated appellant "exhibited prominent delusional beliefs and a level of thought disorganization," but "appeared overall high functioning." She noted, however, that she had only spent limited time with appellant, and did not have access to his mental health records. Thus, she was only able to give a "conservative diagnostic impression."

In her 2022 report, Dr. Matthews again diagnosed appellant with "Delusional Disorder" and opined he was not competent to stand trial. She repeated that she did not have access to his mental health records but observed that his presentation of delusional beliefs was consistent in both interviews.

23.

The parties filed motions in limine addressing the permissible scope of expert testimony.  During the hearing on those motions, the People argued Dr. Sidhu should be precluded from relating hearsay evidence from appellant's mental health records, including the reports of other psychological experts.  As pertinent here, the trial court ruled Dr. Sidhu could testify he relied on the reports of other experts but could not describe their conclusions or diagnoses.

At trial, Dr. Sidhu testified that in forming his opinion, he relied on the reports of other psychological experts, but did not identify them, discuss the contents of their reports, or relate their diagnoses.

**B.**     ***The trial court properly excluded the conclusions of Dr. Matthews.***

Hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated."  (Evid. Code, § 1200, subd. (a).)  "Documents like letters, reports, and memoranda are often hearsay because they are prepared by a person outside the courtroom and are usually offered to prove the truth of the information they contain."  (*People v. Sanchez* (2016) 63 Cal.4th 665, 674.)  Hearsay is inadmissible unless subject to a hearsay exception.  (Evid. Code, § 1200, subd. (b).)

"Experts enjoy wide latitude in the sources they may draw upon, and they are permitted to rely on hearsay in reaching their conclusions.  [Citations.]  That is to say, experts can take hearsay into account when forming their own opinions."  (*People v. Turner* (2020) 10 Cal.5th 786, 821, fn. omitted; see Evid. Code, §§ 801, 802.)  However, an expert cannot "relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception."  (*People v. Sanchez, supra,* 63 Cal.4th at p. 686.)

This prohibition extends to the reports of other experts.  An expert witness may "state the reasons for his or her opinion, and testify that reports prepared by other experts were a basis for that opinion."  (*People v. Campos* (1995) 32 Cal.App.4th 304, 308.)  But

an expert is prohibited from revealing "the content of reports prepared or opinions expressed by nontestifying experts." (*Ibid.;* see *People v. Catlin* (2001) 26 Cal.4th 81, 137; *People v. Landau* (2016) 246 Cal.App.4th 850, 870.) " ' "The reason for this is obvious. The opportunity of cross-examining the other [experts] as to the basis for their opinion, etc., is denied the party as to whom the testimony is adverse." ' " (*Whitfield v. Roth* (1974) 10 Cal.3d 874, 894.)

Dr. Matthews's reports are plainly hearsay, and appellant does not identify an applicable hearsay exception. At most, Dr. Sidhu could have identified Dr. Matthews's reports and testified that he relied on them in forming his opinion. But the contents of those reports, including her diagnoses and conclusions, were inadmissible hearsay. Accordingly, the trial court did not err, and this claim lacks merit.

### C. *Any presumed error was harmless.*

Assuming the trial court should have allowed Dr. Sidhu to relate Dr. Matthews's conclusion, the error was harmless under any standard. Dr. Sidhu opined that appellant was schizophrenic and delusional when he interviewed him in 2019, and that his delusions had grown stronger when he interviewed him again in 2023. Dr. Matthews's diagnoses would only have confirmed that appellant was delusional during this window. This would have been largely redundant and done little to advance the defense theory that appellant acted impulsively when he killed his parents in 2015.

As we explained above, the jury heard extensive defense evidence in support of diminished actuality and rejected it. Given the overwhelming evidence that appellant acted with premeditation and deliberation, there is no basis to conclude that the exclusion of Dr. Matthews's conclusions contributed to the jury's verdict. Accordingly, any presumed error was harmless. (See *Chapman, supra,* 386 U.S. at p. 24; *Watson, supra,* 46 Cal.2d at p. 836.)

**III. The Trial Court Did Not Abuse Its Discretion in Declining to Allow a Defense Witness to Testify Remotely. Any Presumed Error was Harmless.**

Appellant contends the trial court should have allowed an expert witness to testify remotely via videoconference. We conclude this ruling fell within the trial court's broad discretion to control the proceedings and was not an abuse of discretion.

**A.    *Background.***

Dr. Doreen Hughes was appointed by the trial court to evaluate appellant in connection with his plea of not guilty by reason of insanity (NGI). At the time of trial, she resided in North Carolina. The prosecution made arrangements for her to testify during the insanity phase of the trial, which did not occur because appellant withdrew his NGI plea after the guilt phase.

Approximately one month before trial, defense counsel provided the prosecution with Dr. Sidhu's most recent reports pertaining to diminished actuality. The prosecution gave those reports to Dr. Hughes to "get her thoughts on diminished actuality [and] see if she had an opinion." Dr. Hughes responded that she had never evaluated a person for diminished actuality and was not familiar with its definition. She believed appellant suffered from psychosis at the time of the crimes, but said it was possible he was not affected by is psychosis when committing the crimes. She reiterated her previous opinion that appellant did not meet the criteria for NGI.

The prosecution had difficulty coordinating with Dr. Hughes and did not receive her response until the week before the evidentiary portion of the trial was set to begin. After receiving Dr. Hughes's response, the prosecution forwarded a summary of her statement to defense counsel via e-mail.

The next day, defense counsel informed the trial court that Dr. Hughes was now a defense witness, claiming her statement supported the defense theory of diminished actuality. Defense counsel argued that the disclosure of Dr. Hughes's statement

constituted "late" discovery, and therefore the court should allow Dr. Hughes to testify by way of videoconference.

The trial court asked the prosecutor whether she would agree to remote testimony. The prosecutor expressed concern it would pose technical difficulties because when she previously spoke to Dr. Hughes through videoconference, she "could barely hear her." Instead, the prosecutor suggested appellant could serve Dr. Hughes with a subpoena. Defense counsel responded that it would be difficult to arrange flights for her on short notice.

The prosecutor then noted she received a request from Quella to testify remotely. Quella lived out of the area and was scheduled to take a flight to appear in court. Defense counsel refused, contending that Quella had been a known witness since the inception of the case, but Dr. Hughes's statement had only been provided the day before. Defense counsel argued "fundamental fairness" required the court to allow Dr. Hughes to testify remotely, and that refusal to do so would deny appellant a fair trial.

The trial court denied appellant's request, reasoning it would be unfair to allow Dr. Hughes to testify remotely if appellant would not agree to allow Quella to do the same. The court declined to find the prosecution's disclosure of Dr. Hughes's statement constituted late discovery, finding the prosecution acted as quickly as possible under the circumstances.

Defense counsel then argued that appellant would be prejudiced if Dr. Hughes is allowed to testify during the sanity phase of the trial, and it is revealed that she had an opinion on diminished actuality that was not presented during the guilt phase. The trial court responded: "The People have no obligation to subpoena your witnesses. If it's your witness because you think what she's saying is something that you need in your case, you have the obligation of subpoenaing that witness and getting her over here."

## B.     *Applicable law and standard of review.*

" '[T]he use of video conferencing and other electronic communication technology has been found to be permissible in certain circumstances and for certain proceedings in both criminal and civil cases.' " (*People v. Whitmore* (2022) 80 Cal.App.5th 116, 124–125.)  However, the parties do not point to, nor is this court aware of, specific statutory authority or rules of procedure governing a criminal defendant's ability to have a witness testify remotely.  In other words, there is no authority authorizing a defendant to utilize remote testimony at trial, but there is nothing prohibiting it.[4]

We do not doubt, however, that the trial court had the discretion to allow respondent to have Dr. Hughes testify remotely.  In the absence of specific authority, a trial court "possess[es] a constitutionally conferred, inherent authority to 'create new forms of procedure' in the gaps left unaddressed by statutes and the rules of court." (*People v. Lujan* (2012) 211 Cal.App.4th 1499, 1507; see *Citizens Utilities Co. v. Superior Court* (1963) 59 Cal.2d 805, 812; *People v. Avila* (2011) 191 Cal.App.4th 717, 722; Code Civ. Proc., § 128.)  This power " 'arises from necessity where, in the absence of any previously established procedural rule, rights would be lost or the court would be unable to function.' " (*James H. v. Superior Court* (1978) 77 Cal.App.3d 169, 175.)  The exercise of such authority is, of course, limited by constitutional restraints, and may not be "inconsistent with the will of the Legislature" or "usurp the Legislature's role by fundamentally altering criminal procedures." (*People v. Lujan,* at p. 1507; *In re Amber S.* (1993) 15 Cal.App.4th 1260, 1266.)

---

[4]     There is authority addressing the circumstances in which a prosecution witness may testify remotely without running afoul of the confrontation clause.  (See e.g., *Maryland v. Craig* (1990) 497 U.S. 836, 857–858 [right to face-to-face confrontation may be abridged upon a finding of case-specific necessity].)  But as appellant acknowledges, the Sixth Amendment right of confrontation is not implicated here.  Appellant, not the prosecution, sought to have Dr. Hughes testify remotely, and the confrontation clause does not protect the rights of the prosecution.  (U.S. Const, 6th Amend.)

The decision of whether to allow Dr. Hughes to testify remotely fell within the scope of this inherent authority. We review the exercise (or nonexercise) of such authority for an abuse of discretion. (*People v. Lujan, supra,* 211 Cal.App.4th at p. 1507, *Daws v. Superior Court* (2019) 42 Cal.App.5th 81, 86.)

### C. *An abuse of discretion did not occur.*

The trial court's decision to refuse to exercise its inherent authority to allow remote testimony was not an abuse of discretion. Appellant made no showing that Dr. Hughes was unavailable or unable to testify in person. While appellant claims Dr. Hughes could not have been brought from North Carolina to testify on such "short notice," there is no indication defense counsel pursued traditional means of procuring her attendance, such as attempting to subpoena her or contacting her to determine her availability.

We recognize that obtaining the in-person testimony of an out-of-state witness during this time frame would have presented some logistical challenges. But appellant has not shown that the exercise of due diligence to procure Dr. Hughes's attendance would have been futile. For this reason, we reject appellant's premise that the trial courts effectively precluded appellant from calling Dr. Hughes as a witness. Rather, the trial court declined to exercise its inherent authority to afford appellant the convenience of allowing a defense witness to testify remotely.

To the extent appellant suggests the prosecution was at fault for the "short notice" of Dr. Hughes's statements, we are not persuaded. The prosecution received Dr. Sidhu's reports in late September, and after some difficulty coordinating with Dr. Hughes, received her statement on October 26, 2023. The prosecutor immediately disclosed that statement to the defense, in accordance with her discovery obligations under section 1054.1 and *Brady v. Maryland* (1963) 373 U.S. 83, 87. There is no indication the prosecution engaged in sandbagging or unfair practices that unfairly disadvantaged appellant.

Trial courts are vested with " 'broad discretion to control the conduct of a criminal trial .…' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 386; see *People v. Calderon* (1994) 9 Cal.4th 69, 74–75; § 1044.)  Under the circumstances presented here, the trial court's refusal to exercise its inherent authority to allow appellant to have a witness testify remotely was not "arbitrary, capricious, or patently absurd." (*People v. Rodriguez, supra,* 20 Cal.4th at pp. 9–10.)  Accordingly, we conclude the trial court did not abuse its discretion, and this claim lacks merit.

### D.      *Any presumed error was harmless.*

Assuming the trial court abused its discretion, the error was harmless under any standard.  Appellant has not demonstrated Dr. Hughes was unavailable or unable to testify in person, so we cannot conclude the trial court's ruling had the effect of excluding her testimony.  Even assuming it did, there is no basis to conclude it affected the outcome of the trial.  As we have explained, the jury considered and rejected extensive defense evidence of diminished actuality.  Dr. Hughes's proffered testimony would have done little to support this theory.  She was unfamiliar with the concept of diminished actuality and did not give an affirmative opinion that appellant was affected by his psychosis at the time of the crime.  Accordingly, we conclude beyond a reasonable doubt the trial court's refusal to allow Dr. Hughes to testify remotely did not contribute to the verdict, and any presumed error was harmless.  (See *Chapman, supra,* 386 U.S. at p. 24; *Watson, supra,* 46 Cal.2d at p. 836.)

## IV.      The Admission of the Nontestifying Pathologist's Autopsy Reports Did Not Violate Appellant's Sixth Amendment Right to Confrontation.

The autopsies of the deceased were performed by Dr. Walter in 2015.  When appellant's trial began in 2023, Dr. Walter had passed away.  Another pathologist, Dr. Bennett, reviewed the autopsy materials, including Dr. Walter's reports, and offered his own opinions as to the cause of death.  Dr. Walter's reports were also admitted at trial.

We reject appellant's claim that the use of the autopsy reports at trial violated his Sixth Amendment right to confrontation.[5] Dr. Walter's observations of the physical condition of the bodies were not testimonial in nature. In any event, Dr. Walter was unavailable, and appellant had the opportunity to cross-examine him at the preliminary hearing. We also conclude that any presumed error was harmless because the cause of death was established independent of Dr. Walter's conclusions and was not in dispute.

### A. *Background.*

Dr. Walter performed autopsies on the decedents in 2015, and authored reports detailing his findings. During the autopsies, numerous photographs were taken of the bodies.

Dr. Walter testified at the preliminary hearing in 2019, and copies of the autopsy reports were admitted into evidence. Consistent with the reports, he opined that the decedents' cause of death was asphyxiation from manual strangulation. Defense counsel cross-examined Dr. Walter on his findings.

Dr. Walter passed away before trial began in 2023. The prosecution moved in limine to admit his autopsy reports as a business record pursuant to Evidence Code section 1271. The prosecution also noted that Dr. Walter's preliminary hearing testimony was admissible under Evidence Code section 1291, subdivision (a), because he was not available to testify.

The trial court granted the prosecution's request, overruling appellant's hearsay and confrontation objections. The court reasoned the reports were the subject of Dr. Walter's preliminary hearing testimony, and therefore appellant had a prior

---

[5] Appellant erroneously states that the autopsy reports were not admitted at trial. He instead asserts that the contents of the reports were introduced through Dr. Bennett's testimony. Because we conclude the autopsy reports were properly admitted into evidence, we need not separately consider whether Dr. Bennett's testimony violated the confrontation clause.

31.

opportunity to cross-examine him. For the same reason, the court ruled Dr. Bennett could rely on Dr. Walter's reports.

At trial, Dr. Bennett testified he reviewed Dr. Walter's autopsy reports, diagrams he prepared, and photographs from the autopsies, as well as the coroner's reports and their photographs. Based on these materials, he opined that the decedents' cause of death was manual strangulation.

Copies of Dr. Walter's autopsy reports were admitted into evidence. The reports contained a detailed description of the condition of the decedent's bodies, as well as a brief statement explaining that the cause of death was manual strangulation.

### B. *The autopsy reports were properly admitted. Any presumed error was harmless.*

"[The] admission of testimonial statements of a witness who was not subject to cross-examination at trial violates a defendant's Sixth Amendment right of confrontation, unless the witness is unavailable and the defendant had a prior opportunity for cross-examination." (*People v. Edwards* (2013) 57 Cal.4th 658, 705, citing *Crawford v. Washington* (2004) 541 U.S. 36, 59–60.) "Although the high court has not agreed on a definition of 'testimonial,' testimonial out-of-court statements have two critical components. First, to be testimonial the statement must be made with some degree of formality or solemnity. Second, the statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution." (*People v. Dungo* (2012) 55 Cal.4th 608, 619 (*Dungo*).)

In *Dungo*, our high court observed: "An autopsy report typically contains two types of statements: (1) statements describing the pathologist's anatomical and physiological observations about the condition of the body, and (2) statements setting forth the pathologist's conclusions as to the cause of the victim's death." (*Dungo, supra,* 55 Cal.4th at p. 619.)

32.

*Dungo* held the first category of statements are not testimonial because they "merely record objective facts." (*Dungo, supra,* 55 Cal.4th. at pp. 619–620.) "They are comparable to observations of objective fact in a report by a physician who, after examining a patient, diagnoses a particular injury or ailment and determines the appropriate treatment. Such observations are not testimonial in nature." (*Ibid.*, citing *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 312, fn. 2.) *Dungo* also reasoned that criminal investigation is not the primary purpose of an autopsy report's physical description of the decedent's body. (*Dungo*, at p. 621.) Rather, autopsy reports "serve many other equally important purposes." (*Ibid*.) For example, they may be used by the decedents relatives in deciding whether to file a wrongful death action, by insurance companies in determining whether the death was covered by its policy, or to provide answers to grieving family members. (*Ibid.*)

For the reasons set forth in *Dungo*, we conclude Dr. Walter's physical observations of the condition of the decedents' bodies was not testimonial. The admission of this portion of the autopsy reports did not run afoul of the confrontation clause.

Whether Dr. Walter's conclusions as to the cause of death was testimonial presents a different question. But we need not make this determination because Dr. Walter was subject to cross examination at the preliminary hearing. "A State may not introduce the testimonial out-of-court statements of a forensic analyst at trial, unless she is unavailable and the defendant has had a prior chance to cross-examine her." (*Smith v. Arizona* (2024) 602 U.S. 779, 802–803; see *Crawford v. Washington, supra,* 541 U.S. at p. 68; *Melendez-Diaz v. Massachusetts, supra,* 557 U.S. at p. 311.) Dr. Walter's reports fell squarely within this exception. It is undisputed that Dr. Walter was deceased and therefore unavailable to testify a trial. Moreover, at appellant's 2019 preliminary hearing, defense counsel had the opportunity to, and did, cross-examine Dr. Walter on the contents of his autopsy reports. Under these circumstances, the confrontation clause was not implicated by the admission of Dr. Walter's reports.

33.

Appellant argues this exception to the confrontation clause was inapplicable because Dr. Walter's prior testimony was not admitted at trial. But appellant provides no authority imposing such a requirement. "[T]he basic objective of the Confrontation Clause … is to prevent the accused from being deprived of the opportunity to cross-examine the declarant about statements taken for use at trial." (*Michigan v. Bryant* (2011) 562 U.S. 344, 358.) At the preliminary hearing, appellant had a "prior chance to cross-examine" Dr. Walter about the contents of the autopsy reports. (*Smith v. Arizona, supra,* 602 U.S. at pp. 802–803.) The prosecution was not obligated to admit that prior testimony as a precondition to admitting the autopsy reports.

Even assuming the admission of Dr. Walter's conclusions as to the cause of death violated the confrontation clause, the error was harmless. Dr. Bennett reviewed Dr. Walter's reports but offered his own opinion that the cause of death was manual strangulation. Appellant admitted to law enforcement he killed his parents by strangling them with his hands. At trial, appellant did not dispute that he killed his parents in this manner. His defense was that he did not harbor the requisite mental states for first degree murder. Because the cause of death was undisputed and proven independent of Dr. Walter's opinion, we conclude no prejudice was possible under any standard. (See *People v. Edwards* (2013) 57 Cal.4th 658, 707 [admission of nontestifying pathologist's opinion was harmless because cause of death was not in dispute]; *People v. Pearson* (2013) 56 Cal.4th 393, 463–464 [same]; *People v. Trujeque* (2015) 61 Cal.4th 227, 276 [same].)

## V. The Admission of Appellant's "187" Tattoo was Harmless.

The trial court admitted two photos of appellant's person that show he had a tattoo on his arm of the number "187." Appellant contends the trial court's failure to exclude the photos under Evidence Code section 352 was an abuse of discretion. We need not address the merits of this claim because any presumed error was harmless.

### A.    Background.

After appellant was arrested, law enforcement took numerous photos of his person.  Two of the photos were of appellant's back without a shirt on, and showed he had a tattoo of the number "187" on his left triceps.  Another photo showed a closeup of the tattoo.

Prior to trial, appellant objected to these photographs, arguing they were irrelevant and prejudicial under Evidence Code section 352.  The prosecutor responded the tattoo was relevant to premeditation.  Additionally, the two photos showing appellant's back were relevant to demonstrate he was mostly uninjured.

The trial court excluded the closeup photo of the tattoo, but ruled the other two would be admitted.  It reasoned the photos of his back were relevant to show his lack of injuries, and the tattoo was relevant to his mental state.

Appellant then filed a motion requesting the court reverse its ruling or redact the tattoo from the photos.  Appellant argued there was no evidence that the tattoo was related to the killings.  The trial court declined to amend its previous ruling.

At trial, the two photos in question were admitted, as were approximately 20 other photographs of appellant's person taken by law enforcement.

### B.    Any presumed error was harmless.

We need not consider whether admission of the photographs was erroneous because any presumed error was harmless.  "[T]he application of ordinary rules of evidence like Evidence Code section 352 does not implicate the federal Constitution, and thus we review allegations of error under the 'reasonable probability' standard of [*Watson*]."  (*People v. Marks* (2003) 31 Cal.4th 197, 227.)

As we have noted repeatedly, the evidence of guilt was overwhelming.  Appellant admitted that he strangled his parents to death.  His prior threats to kill his parents, and the way he killed them, conclusively demonstrated he acted with premeditation and deliberation.  Against this backdrop, the "187" tattoo was of minimal significance.  The

prosecution only mentioned the tattoo once during closing argument to argue appellant did not act impulsively when he killed his parents.

Appellant claims the tattoo was prejudicial because it suggested he had a propensity "toward extreme violence." But any potential prejudice was overshadowed by other, lawfully admitted propensity evidence. The trial court admitted evidence of several uncharged acts of domestic violence and elder abuse under Evidence Code section 1109, subdivision (a), including evidence appellant repeatedly strangled the mother of his children, threatened to kill his parents, and assaulted his father. This evidence was admissible to show appellant had a propensity to commit such crimes, and the jury was instructed accordingly. (*People v. Hoover* (2000) 77 Cal.App.4th 1020, 1024.) With or without the tattoo, the jury had a compelling basis to infer appellant had a propensity to commit violence. Thus, to the extent the tattoo gave rise to a propensity inference, any prejudicial effect was minimal. We therefore conclude it was not reasonably probable appellant would have obtained a more favorable result had the tattoo been excluded. (See *Watson, supra,* 46 Cal.2d at p. 836.) Any presumed error was harmless.

## VI.  The Prosecutor Did Not Commit Misconduct During Closing Argument by Using Analogies to Explain Premeditation and Deliberation. Any Presumed Error was Harmless.

During closing argument, while explaining the concepts of premeditation and deliberation, the prosecutor used the analogies of the decision to swing at a pitch in baseball or drive through a yellow traffic light. Appellant contends this was prosecutorial misconduct because it minimized the gravity of the decision to kill and the time necessary to meaningfully reflect. We disagree.

### A.  *Background.*

The prosecutor stated the following during closing argument:

"The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person according to the circumstances. And you can look at all of the surrounding circumstances and the past in determining whether or not somebody acted with premeditation and deliberation.

"A cold and calculated decision to kill can be reached very quickly. The length of time alone is not determinative. Basically, the time that it takes for someone who goes to a baseball game and is on a baseball team to step up to the plate, to grab the bat, and to have a ball be thrown at him somewhere between 70 miles an hours to 100 miles an hour, that split decision as to whether or not he's going to hit the ball or whether he's going to wait and see if it's a ball, that's the split amount of time it takes to make a decision. That's the only amount of time that it takes to form the decision to make a decision as to what's going to happen.

"Now, in this case, you can also take into consideration that somebody has to actually get onto a baseball team, right. They have to have gone through all of their practices, probably played little league all the way up through high school, maybe college, and then they get to the major leagues here. And that that person is working out, getting ready to play baseball. They put on the uniform.

"Here, all of those actions you can take into consideration with this defendant. That for years, he had been fighting with his parents, 20 years at least that's documented, that we know of, that he threatened them, and that he told them that if they called law enforcement that he would give them a reason to put him away forever. Each and every second of that is part and parcel of him getting up to the plate that day and making that decision to take it further than he had with anybody else that he had strangled, to not let go and to kill them."

The prosecutor's "Powerpoint" presentation included a slide that read: "Premeditation and Deliberation can be formed in that split second decision as to whether to swing at the ball or not. Quality of deliberation is of importance, not the length of time it takes to do so."

At this point in the argument, defense counsel objected: "Incorrectly states the law; improper argument." The trial court overruled the objection.

The prosecutor continued:

37.

"Another way you can think of willfully, deliberate, and premediated is when you're driving and you come to a yellow light. The decision as to whether you're going to do through the yellow light or you're going to stop and wait until it turns red. You have to take a lot of things into consideration. You have to consider whether you're going to press on the gas or you're going to stop. You're looking to the right, you're looking to the left, you're looking behind you, you're looking for pedestrians, any kind of animals that may be in the roadway. You're scanning the area and you're taking all of that into consideration in the choice that you make as to whether or not you're going to stop.

"And so, while the decision to kill is of course more than a decision to just go through a yellow light, it is an example of how we make decisions in our everyday life as to what we're going to do, how we deliberate and premeditate in our daily lives, as to what we're going to do in that situation when we get up to the yellow light."

**B.      *Standard of review.***

Prosecutorial misconduct occurs when " '[a] prosecutor … uses deceptive or reprehensible methods to persuade the jury.' " (*People v. Parson* (2008) 44 Cal.4th 332, 359.) "When a claim of misconduct is based on the prosecutor's comments before the jury … ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' " (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 305.)

**C.      *The prosecutor did not misstate the law or mislead the jury.***

"An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." (*People v. Stitely*, *supra*, 35 Cal.4th at p. 543.) "[U]nder California law premeditation and deliberation can occur in a brief period of time." (*People v. Brady* (2010) 50 Cal.4th 547, 563.) " ' "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly…." ' " (*People v. Koontz*, *supra*, 27 Cal.4th at p. 1080.)

Consistent with these principles, the prosecutor's analogies illustrated "the requisite reflection need not span a specific or extended period of time." (*People v. Stitely*, *supra,* 35 Cal,4th at p. 543.) As with the decision to swing at a baseball or drive through a yellow light, premeditated and deliberate murder may involve the weighing of several considerations in rapid succession. The prosecutor used the analogies to highlight that the fundamental inquiry is the nature of the reflection, not the quantum of time spent reflecting.

In *People v. Avila* (2009) 46 Cal.4th 680, 715, the prosecutor used the same "yellow light" analogy employed here. The Supreme Court concluded the argument was proper: "[T]he prosecutor used the example of assessing one's distance from a traffic light, and the location of surrounding vehicles, when it appears the light will soon turn yellow and then red, and then determining based on this information whether to proceed through the intersection when the light does turn yellow, as an example of a 'quick judgment' that is nonetheless 'cold' and 'calculated.' " (*Ibid.*) Similarly, in *People v. Son*, which also involved the prosecutor's use of the "yellow light" analogy, the court concluded, "We see no error in the yellow light example. At least in the way the prosecutor framed it, if someone were to go through the decisionmaking process the prosecutor described, the decision to proceed through the intersection would be premeditated." (*People v. Son* (2020) 56 Cal.App.5th 689, 699.)

The baseball analogy was proper for similar reasons. It was used by the prosecutor to provide a fair understanding of how a person could weigh the consequences of his or her actions quickly in making the decision to act. The prosecutor did not argue that every swing of the bat would show deliberation regardless of whether it was purely instinctual or reflexive. Rather, the prosecutor explained that while the decision to swing must be made quickly, it may nonetheless be conscious and deliberate.

We also reject appellant's claim that the prosecution's analogies "trivialize[d]" premeditation and deliberation by suggesting the decision to kill is equivalent to less

consequential, everyday decisions. It was appropriate for the prosecutor to use "illustrations drawn from common experience" to explain the legal concept of premeditation and deliberation. (*People v. Wharton* (1991) 53 Cal.3d 522, 567.) But the prosecutor also clarified that "the decision to kill is of course more than a decision to just go through a yellow light," and is an example of how people premeditate and deliberate in their daily lives. There is no basis to conclude the prosecution misled the jury as to nature of the reflection necessary to establish premeditation and deliberation.

Considering the above authorities, we conclude the prosecutor's analogies and argument correctly reflected the applicable law of premeditation and deliberation. Accordingly, the prosecutor did not mislead the jury, and there is no reasonable likelihood the jury misapplied the law. This claim is without merit.

### D.    *Any presumed error was harmless.*

Assuming the prosecutor's use of analogies was objectionable, the error was harmless under any standard.

The trial court correctly instructed the jury on premeditation and deliberation in CALCRIM No. 521. The jury was also instructed that it must follow the court's instructions even if they conflict with the arguments of counsel. (CALCRIM No. 200). In the absence contrary indication, we presume the jury understood and followed these instructions. (*People v. Fauber* (1992) 2 Cal.4th 792, 823; *People v. Thornton* (2007) 41 Cal.4th 391, 441.)

Additionally, as we have explained, the evidence of premeditation and deliberation was overwhelming. Appellant unquestionably had ample time and opportunity to reflect on the deadly consequences of his actions. The prosecutor's analogies were not remotely comparable to the extensive reflection involved in strangling multiple people to death. Accordingly, the prosecutor's examples of premeditation and deliberation being formed

quickly, even if erroneously offered, could not have contributed to the jury's verdict.[6]
(See *Chapman, supra,* 386 U.S. at p. 24; *Watson, supra,* 46 Cal.2d at p. 836.)

## VII. Appellant is Subject to Only One Multiple-Murder Special Circumstance. We Strike the Duplicative Finding.

Appellant was charged with two multiple-murder special-circumstance allegations. (§ 190.2, subd. (a)(3).) The jury found both allegations true, and the trial court sentenced appellant to two consecutive terms of life in prison without the possibility of parole.

Appellant contends, and respondent agrees, it was error to allege more than one multiple-murder special circumstance. We agree with the parties. "A defendant charged with two murders may be charged with only one multiple-murder special circumstance." (*People v. Crandell* (1988) 46 Cal.3d 833, 880, abrogated on other grounds by *People v. Crayton* (2002) 28 Cal.4th 346, 365–365; see *People v. Halvorsen* (2007) 42 Cal.4th 379, 422; *People v. Jones* (1991) 53 Cal.3d 1115, 1148.)

Accordingly, we strike one of the two multiple-murder special-circumstance findings. The trial court is directed to prepare an amended indeterminate abstract of judgment showing only one multiple-murder special-circumstance finding.[7]

## DISPOSITION

One of the two multiple-murder special-circumstance findings pursuant to section 190.2, subd. (a)(3), is stricken. The trial court shall prepare an amended

---

[6] Appellant argues that the alleged error here, combined with the alleged errors in parts I, II, and III, had a cumulative prejudicial effect because they all bear on the issue of whether appellant acted with the requisite mental state. We reject this assertion because we have found each individual contention lacked merit and did not result in prejudice. (See *People v. Bradford* (1997) 14 Cal.4th 1005, 1057.)

[7] This change does not affect the validity of the trial court's imposition of two consecutive sentences of life without the possibility of parole. (*People v. Garnica* (1994) 29 Cal.App.4th 1558, 1564.)

41.

indeterminate abstract of judgment reflecting only one multiple-murder special-circumstance finding. The trial court shall then forward the amended indeterminate abstract of judgment to the appropriate authorities. In all other respects, the judgment is affirmed.

LEVY, Acting P. J.

WE CONCUR:

FRANSON, J.

MEEHAN, J.